## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

GEZO GOEONG EDWARDS, *et al.*,

   Defendants.

**Criminal Nos. 11-129-1, 2, 11 (CKK)**

## MEMORANDUM OPINION
(July 26, 2012)

Defendants Gezo Goeong Edwards, William Bowman, Henry Brandon Williams, and eleven co-Defendants were charged by superseding indictment with one count of conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine and thirteen other individual counts. Superseding Indictment, ECF No. [28], at 1-8. Defendants Edwards, Bowman, and Williams are proceeding to trial. Presently before the Court are the following motions *in limine*:

- Defendant Edwards' [241] Motion to Suppress Evidence Seized from 1219 Elm Grove Circle, Silver Spring, MD;

- Defendant Edwards' [242] Motion to Suppress Evidence Obtained from Interception of Visual Non-Verbal Conduct in or Near Storage Unit A306;

- Defendant Edwards' [244] Motion to Suppress Evidence Obtained from Interception of Wire Communications and Seizure of Electronic Communications;

- Defendant Edwards' [247] Motion to Amend Motion to Suppress Evidence Obtained from Interception of Wire Communications (Doc #244);

- Defendant Bowman's [248] Motion to Suppress Evidence and Statements Resulting from Illegal Wiretap Surveillance;

- Defendant Bowman's [252] Motion to Suppress Evidence Obtained from the Search and Seizure of the Defendant's Cell Phones After His Arrest on April 26,

2011, as Fruit of the Poisonous Tree;

- Defendant Bowman's [253] Motion to Suppress Statements Made by the Defendant After his Arrest on April 26, 2011, as Fruit of the Poisonous Tree;

- Defendant Bowman's [256] Motion to Suppress Visual and Non-Verbal Evidence Obtained from the Use of a Closed Circuit Television ("CCTV") Placed Inside of Storage Unit A306, at the Public Storage Store Located at 3005 Kenilworth Avenue, Hyattsville, Maryland; and

- Defendant Bowman's [257] Motion to Suppress Evidence Obtained from Storage Unit A306, at the Public Storage Store Located at 3005 Kenilworth Avenue, Hyattsville, Maryland.

Defendant Edwards' [244] motion to suppress and Defendant Bowman's [248] motion to suppress seek to suppress the wiretap interception authorizations issued for telephones purportedly used by Defendant Bowman. Defendant Edwards' [247] motion to amend seeks to amend his motion to suppress the wiretap to include the affidavits filed in support of the wiretap applications, which were inadvertently omitted from his initial filings. The other motions listed above ask the Court to suppress other evidence obtained at least in part because of the intercepted communications, on the basis that this evidence is "fruit of the poisonous tree." For the reasons stated below, Defendant Edwards' [247] Motion to Amend Motion to Suppress Evidence Obtained from Interception of Wire Communications is GRANTED; the remaining motions are DENIED.

## I. BACKGROUND

The Government alleges that from January 2009 until April 2011, the Defendants engaged in a conspiracy to distribute and possess with intent to distribute large quantities of cocaine. Superseding Indictment at 1-3. Specifically, the Government asserts that Defendants Edwards and Bowman obtained large quantities of cocaine from supplier(s) in southern California, and transported the cocaine back to the Washington, D.C. metropolitan area. Gov't

Resp., ECF No. [290], at 2.  Defendant Bowman would then (1) distribute some of the cocaine to other narcotics traffickers, including Defendant Williams; (2) distribute some of the cocaine on behalf of Defendant Edwards; and (3) convert some of the cocaine to cocaine base ("crack cocaine"), and distribute the crack cocaine to his own customers.  *Id.*  As part of the investigation, the Government applied for and received several court-authorized wiretap interceptions of three separate cellular telephones, discussed below.

A.      *Target Telephone 1: 202-262-2549*

On December 7, 2010, the Government submitted an application for an order authorizing the interception of wire communications to and from Target Telephone 1.  The Affidavit of FBI Special Agent Timothy S. Pak noted that the cellular phone was registered to John Doe and associated with a fictitious address in the District of Columbia, but had been used by Bowman on several occasions.  12/7/10 Pak Aff. ¶¶ 4b, 7.  Judge Richard W. Roberts granted the application, but the wiretap was terminated due to a lack of activity on December 27, 2010.  Gov't Resp. at 4 n.3.  1/13/11 Pak Aff. ¶ 4c.

B.      *Target Telephone 2: 202-445-1553*

On January 13, 2011, the Government submitted an application for an order authorizing the interception of wire communications to and from Target Telephone 2.  1/13/11 Pak Aff.  TT2 was registered to "Sam Leonard" and associated with a fictitious address in the District of Columbia.  *Id.* at ¶ 7.  The Affidavit listed Bowman, Andrew Colter, Omar Ismaeel, Slonsio Cheah, and Michael Rivers as possible targets of the wiretap.  *Id.* at ¶ 5.  It specifically alleged that the investigation "has determined that Bowman is utilizing the target telephone to discuss and facilitate drug trafficking in the Washington, D.C. area," and the wiretap was sought in order to determine:

(i)     "the nature scope, and extent of the narcotics trafficking and other illegal activities in which the targets are engaged";

(ii)    "the methods of operations and procedures of the targets including, but not limited to, the means and manner by which individuals are obtaining and redistributing large quantities of cocaine in various locations in the United States";

(iii)   "the identities, roles, and telephone numbers of participants in the illegal activities, including accomplices, aiders and abettors, co-conspirators, and other participants in their illegal activities";

(iv)    "the source of money and controlled substances, primarily cocaine";

(v)     "the manner in which these illegal activities are being conducted, including the distribution and possession of said controlled substances, and the money involved in those activities";

(vi)    "the existence and location of apartments, residences, businesses, and other premises utilized in furtherance of these illegal activities";

(vii)   "the methods of operation for laundering proceeds of illegal drug sales";

(viii)  "the existence and location of records of the illegal activities";

(ix)    "the existence, location, and source of the resources used to finance the illegal activities";

(x)     "the existence, location, and disposition of the proceeds from those activities";

(xi)    "the existence and locations of other items or means used in furtherance of those activities";

(xii)   "the dates, times, and details for the continued commission of the above-mentioned offenses"; and

(xiii)  "other evidence necessary for the successful prosecution and conviction of the above-described criminal activities."

1/13/11 Pak Aff. ¶¶ 7, 9b.  The factual allegations contained in the Affidavit are discussed at length *infra*, Section III.A, C.  Chief Judge Royce C. Lamberth authorized the wiretap for thirty days.  Gov't Ex. A.  Judge Richard W. Roberts reauthorized the wiretap for additional thirty day periods on February 11, 2011, March 11, 2011, and April 8, 2011.  Gov't Exs. B-D.  Defendant

Edwards was added as a possible target as part of the April 8, 2011 reauthorization. 4/8/11 Pak Aff. ¶ 6.

### C.    *Target Telephone 3: 202-425-5430*

On March 19, 2011, the Government submitted an application for an order authorizing the interception of wire communications to and from Target Telephone 3. 3/21/11 Pak Aff. TT3 was registered to William Bowman and associated with 125 16th Street, NE, Washington, D.C. *Id.* at ¶ 7. The Affidavit listed Bowman, Edwards, Slonsio Cheah, Tracy Brooks, Willie Moorer, Robert Richards, and Shawn Lucas as possible targets of the wiretap. *Id.* at ¶ 5. Judge Roberts reauthorized the wiretap for an additional thirty days on April 15, 2011. Gov't Ex. F.

### D.    *Superseding Indictment*

The Grand Jury returned the Superseding Indictment on June 16, 2011, charging fourteen Defendants with one count of conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine. Superseding Indictment at 2-3. The Superseding Indictment alleges the Defendants engaged in the conspiracy from about January 2009 until at least April 26, 2011. *Id.* at 2. In addition to Edwards, Bowman, and Williams, the Superseding Indictment named Robert Richards, Willie Moorer, Nathaniel Harrison, Omar Ismaeel, Earl Charles, Sean Crawford, Joseph Tolbert, William Wilson, Jr., Roscoe Minns, Tracy Brooks, and Shawn Lucas as co-Defendants and co-conspirators. *Id.* at 2-3. Defendant Edwards faces two counts of using, carrying, and possessing a firearm during a drug trafficking offense in violation of 18 U.S.C. § 924(c). *Id.* at 6. Defendant Bowman also faces three counts of using, carrying, and possessing a firearm during a drug trafficking offense in violation of 18 U.S.C. § 924(c), three counts of unlawful distribution of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and two counts of unlawful distribution of cocaine base in violation of 21 U.S.C. §§ 841(a)(1),

841(b)(1)(C).[1]  *Id.* at 3-4, 6-7.  Defendant Williams is only charged in the conspiracy count.

## II.  LEGAL STANDARD

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.*, provides that a district court may authorize an application for interception of certain wire, oral, and/or electronic communications.  18 U.S.C. § 2518.

> Upon such application the judge may enter an ex parte order, as requested or as modified, authorizing or approving interception of wire, oral, or electronic communications within the territorial jurisdiction of the court in which the judge is sitting (and outside that jurisdiction but within the United States in the case of a mobile interception device authorized by a Federal court within such jurisdiction), if the judge determines on the basis of the facts submitted by the applicant that--
>
> > (a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;
> >
> > (b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;
> >
> > (c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;
> >
> > (d) except as provided in subsection (11), there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

18 U.S.C. § 2518(3).  Subsection "c" is referred to as the "necessity requirement."  *United States v. Carter*, 449 F.3d 1287, 1292 (D.C. Cir. 2006).  The statute further provides specific requirements for the contents of the order granting an application under Title III, including that

---

[1]  The Superseding Indictment charged Defendant Bowman with two counts of unlawful distribution of 5 grams or more of cocaine base, but the Government indicated it will proceed against Defendant Bowman on the lesser included offense of unlawful distribution of cocaine base.  Gov't Resp. at 3 n.2.

the order require that the interception "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter." 18 U.S.C. § 2518(5). This "minimization requirement" obliges the Government to make reasonable efforts to minimize the interception of non-relevant conversations. *Carter*, 449 F.3d at 1292.

Any "aggrieved person"—that is, any person who was a party to any intercepted communication, 18 U.S.C. § 2510(11)—may move to suppress the contents of any interception under Title III on the basis that: (1) "the communication was unlawfully intercepted"; (2) "the order of authorization or approval under which [the communication] was intercepted is insufficient on its face"; or (3) "the interception was not made in conformity with the order of authorization or approval." 18 U.S.C. § 2518(10)(a). Here, Defendants Bowman and Edwards contend their communications were "unlawfully intercepted," and that the interceptions did not conform to the court's authorization insofar as the Government did not comply with the minimization requirement. The Defendants also request a *Franks* hearing to challenge the application in the event the Court determines the affidavit is facially valid.

> A movant seeking to obtain a Franks hearing must show that (1) the affidavit contained false statements; (2) the statements were material to the issue of probable cause; and (3) the false statements were made knowingly and intentionally, or with reckless disregard for the truth. To mandate an evidentiary hearing, the movant's attack on the affidavit supporting the warrant must be more than conclusory.

*United States v. Becton*, 601 F.3d 588, 594 (D.C. Cir. 2010) (internal quotation marks and citations omitted).

## III. DISCUSSION

The Defendants' motions challenge the validity of the initial authorization for interception of communications to and from TT2 on January 13, 2011, and by extension all future authorizations on TT2 and TT3, but do not independently challenge the validity of any

later authorizations. Defendants allege the January 13, 2011 authorization is invalid for three reasons: (1) facially, the warrant did not meet the necessity requirement for issuance of a wiretap; (2) the Government did not comply with the minimization requirement in carrying out the wiretaps; and (3) Special Agent Pak's Affidavit omitted material information, entitling the Defendants to a *Franks* hearing regarding the validity of the wiretap authorization. The Court finds the January 13, 2011 Affidavit met the necessity requirement for a Title III wiretap, the Defendants failed to set forth a challenge the Government's minimization efforts, and the Defendants failed to make a substantial showing that the Government omitted material information from the wiretap affidavit. Accordingly, Defendants' motions to suppress the Title III wiretaps are denied.

A.      *The January 13, 2011 Pak Affidavit Provides Sufficient Facts to Establish the Necessity of the Requested Interceptions*

Defendants contend that Special Agent Pak's January 13, 2011 Affidavit failed to satisfy Title III's necessity requirement because it failed to establish that traditional investigative techniques were insufficient. "Congress created the necessity requirement to ensure that 'wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'" *Carter*, 449 F.3d at 1293 (quoting *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974)). Although the Court must "give close scrutiny" to contested applications and "reject[] generalized and conclusory statements that other investigative procedures would prove unsuccessful," "the statutory command was not designed to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted." *United States v. Williams*, 580 F.2d 578, 588 (D.C. Cir. 1978) (internal quotation marks omitted). "[A] court may authorize the wiretap of the phone of a member of an operation if traditional investigative techniques have proved inadequate to reveal the operation's 'full

8

nature and scope.'" *United States v. Brown*, 823 F.2d 591, 598 (D.C. Cir. 1987) (quoting *Williams*, 580 F.2d at 590). In this case, Defendants argue that Special Agent Pak's Affidavit fails to allege with sufficient particularity that (1) undercover officers/confidential sources; (2) physical surveillance; (3) trash covers; (4) search warrants/Grand Jury subpoenas; and (5) pen registers would be insufficient to reveal the full scope of Bowman's suspected operation.

### 1. Undercover Officers/Confidential Sources

Special Agent Pak's Affidavit indicates that neither undercover officers nor confidential sources would be successful in learning Bowman's source(s) of cocaine or the hierarchy of Bowman's organization for two reasons: (1) individuals like Bowman do not want to reveal their sources and have their customers go to the source directly for narcotics; and (2) Bowman specifically was guarded about revealing the location of his stash house(s) and other details of his operation. 1/13/11 Pak Aff. ¶ 38. Defendants challenge the Affidavit's conclusions, arguing Special Agent Pak offered no explanation as to why the undercover officer and sources could not obtain additional information, since Bowman was not "guarded" in so far as he sold crack cocaine to the undercover officer and CS-2, despite not knowing either individual. Special Agent Pak specifically averred that the undercover officer "was unable to obtain any information about Bowman's narcotics trafficking organization." *Id.* Moreover, the fact that Bowman was willing to sell narcotics to the undercover officer and confidential sources he barely knew does not negate Special Agent Pak's observation that Bowman kept certain information, such as the location of his stash house, from his customers. *Id.*

Defendant Edwards offers a new argument in his reply, stating that the fact Bowman had to travel to his stash house to obtain the narcotics during controlled purchases "shows [sic] common practice among drug dealers, who typically do not carry drugs on their persons for fear

of being arrested or robbed." Def. Edwards' Reply, ECF No. [303], at 3. Even if this assertion were true, it does not establish why Bowman declined to disclose the location of his stash house to the confidential sources, arranging to sell the narcotics at a neutral location. Moreover, Defendants do not dispute that because the confidential sources were merely customers and not members of Bowman's organization, Bowman would not reveal details of the organization to them. 1/13/11 Pak Aff. ¶ 39. Defendants speculate that "neither CS1 nor the [undercover officer] ever attempted to learn more about Bowman's organization." Def. Edwards' Reply at 4. Assuming the Court was to read the Pak Affidavit in the manner suggested by Defendants, the Government was not required to pursue this course in light of the other evidence in the affidavit indicating such inquiries likely would have been unsuccessful.

For the first time in his Reply, Defendant Edwards contends the Government misled the court by failing to disclose that CS-1 was incarcerated for a period of time with Bowman, and the two actually shared a cell. If anything, this information would have bolstered the conclusion that CS-1 could not obtain additional information about Bowman's organization: despite their history, Bowman only met CS-1 in neutral locations, and would not reveal to CS-1 where the stash house was located. 1/13/11 Pak Aff. ¶ 38.; *id.* at ¶¶ 19, 20.

The Defendants take issue with Special Agent Pak's contention that Bowman was suspicious of CS-2 as indicated by Bowman's refusal to provide CS-2 with his new telephone number (TT2) after abandoning TT1. Defendants contend that Special Agent Pak's conclusion "is completely belied by the fact the CS2 had another working number for Bowman and that they used that number to discuss drug dealing." Def. Edwards' Mot. at 10. This argument misses the point. The issue with CS-2 was not that he/she could not get in touch with Bowman, but rather that Bowman's refusal to provide CS-2 with TT2 after multiple requests reflected the fact

Bowman was suspicious of CS-2. It is because of this suspicion—not a lack of means to contact Bowman—that meant CS-2 would not be a further source of useful information. 1/13/11 Pak Aff. ¶¶ 26-27, 38.

Curiously, Defendants argue that "[a]lthough CS3 was apparently incarcerated as a result of it's [sic] continued drug dealing even after it began cooperating, there is nothing in the Affidavit to indicate that CS3 could not be a further source for information to law enforcement." Def. Edwards' Mot. at 10. Special Agent Pak explained that at the time of the affidavit "CS-3 [was] incarcerated and therefore no longer in a position to proactively cooperate in the investigation." 1/13/11 Pak Aff. ¶ 38. Given CS-3's incarceration, "it would be unreasonable to require pursuit of [this] avenue[] of investigation," before resorting to a wiretap. *Carter*, 449 F.3d at 1293. Defendants note that CS-3 was able to obtain some insight into Bowman's operation; the Affidavit notes that Bowman purportedly informed CS-3 that Bowman typically purchases four kilograms of cocaine at a time. The Affidavit also reflects the fact that CS-3 purchased quantities of cocaine from Bowman that were significantly greater than those purchased by both CS-1 and CS-2. *Compare* 1/13/11 Pak Aff. ¶ 16 (indicating on multiple occasions CS-3 purchased 125 grams of cocaine from Bowman) *with id.* at ¶¶ 19, 22 (noting CS-1 and CS-2 purchased from Bowman 11 grams and 63 grams of narcotics respectively). The fact that Bowman was more open with a customer who purchased significantly greater quantities of cocaine does not negate the evidence in the Affidavit to indicate Bowman was guarded in his interactions with other customers, including CS-1, CS-2, and the undercover officer.

Defendants further argue that Special Agent Pak's statement that the confidential sources supplied information such as "telephone numbers, descriptions of vehicles, names, [and] addresses" calls into question Special Agent Pak's ultimate conclusion that confidential sources

could not reveal the full scope of Bowman's operation. To be precise, Special Agent Pak only made this statement as to CS-1, not CS-2. 1/13/11 Pak Aff. ¶ 12, 15. But fundamentally, this statement is consistent with Special Agent Pak's description of the confidential sources' roles in arranging and performing controlled purchases of narcotics. The Affidavit indicates the confidential sources provided phone numbers for Bowman and information concerning controlled buys, none of which contradicts Special Agent Pak's conclusion that the sources could not provide any *additional* information regarding the conspiracy at large. The affidavit contained sufficient facts for Chief Judge Lamberth to find that confidential sources and controlled purchases could not reveal the full scope of Bowman's suspected operation, and therefore a wiretap under Title III was necessary.

2.    <u>Physical Surveillance</u>

Special Agent Pak explained that "[a]lthough physical surveillance has provided some helpful information," it is by itself of limited value to investigators. 1/13/11 Aff. ¶ 40. For this investigation, Special Agent Pak noted that investigators observed two meeting between CS-1 and Bowman in July 2010. *Id.* Agents observed Bowman arrive at the meeting location, leave the meeting and travel to his apartment building, then return to the meeting with CS-1. *Id.* The Government believes that Bowman retrieved narcotics from his residence, but "physical surveillance alone was unable to confirm that Bowman actually retrieved narcotics from this location, and if so, where specifically within the building the narcotics were stored." *Id.* Moreover, Bowman did not conduct a significant amount of his narcotics activity outside, further limiting the usefulness of physical surveillance, including pole cameras. *Id.* at ¶¶ 40-41. Defendants' motions omit any reference to these specific limitations of physical surveillance of Bowman's activities. Defendants claim that Bowman did not detect any physical surveillance

and would not necessarily flee if he determined he was being observed. Even if this were true, Defendants never respond to Special Agent Pak's contention that given the nature of Bowman's organization, physical surveillance would never disclose the entirety of the organization. The Affidavit indicates the Government engaged in physical surveillance and obtained some useful information, but at the point it would continue to fail to reveal the full scope of the conspiracy, the necessity requirement was satisfied. *Becton*, 601 F.3d at 596.

In his Reply, Defendant Edwards suggests that the physical surveillance attempted in this case was inadequate because the Affidavit refers to physical surveillance only in the context of five controlled purchases of narcotics. Def. Edwards' Reply at 9. Defendant's reliance on *United States v. Gonzalez*, 412 F.3d 1102 (9th Cir. 2005) for this proposition is misplaced. In *Gonzalez*, the investigators only attempted a single instance of physical surveillance before giving up, compared to five instances in this case. *Id.* at 1114. Through these five observations, investigators confirmed that Bowman engaged in most of his conduct indoors, while the investigators in *Gonzalez* could only speculate after a single, brief instance of physical surveillance. *Id.* Moreover, the Ninth Circuit employs a different standard for necessity than this Circuit. *Compare id.* at 1112 *with Brown*, 823 F.2d at 598. The five instances of physical surveillance, and the related factual detail regarding Bowman's operation, were sufficient to show that physical surveillance would not reveal the full scope of Bowman's operation, and wiretaps were therefore necessary. *Brown*, 823 F.2d at 598.

3.    Trash Covers

In terms of performing trash covers, Special Agent Pak explained that Bowman resided in a multi-story apartment building, which utilized a communal trash dumpster located between the building in which Bowman resided and another multi-unit apartment building, in view of

apartments from both buildings and the street. 1/13/11 Pak Aff. ¶ 43. The dumpster itself was enclosed by a secure five-foot fence. *Id.* Thus, it would be difficult, if not impossible, for agents to search the dumpster without being detected. *Id.* Special Agent Pak further noted that multiple units used the dumpster, making it virtually impossible to link any trash to Defendant Bowman. *Id.*

The Defendants fault Special Agent Pak for failing to explain "why a trash cover could not be conducted under cover of darkness . . . or whether any agents of the FBI would have trouble climbing the fence." Def. Edwards' Mot. at 13. Assuming for the sake of argument that agents could access the dumpster, and could do so undetected, the Affidavit established any search of the dumpster would be futile because the Government would face extreme difficulty in connecting Defendant Bowman to evidence recovered from a *communal* dumpster. Requiring the Government to engage in a trash cover that was not likely to succeed in recovering any usable evidence would be unreasonable. A trash cover was "impracticable under the circumstances" and therefore not necessary before resorting to a wiretap application. *Carter*, 449 F.3d at 1293.

### 4. Search Warrants/Grand Jury Subpoenas

The Affidavit explains that agents had not sought or executed any search warrants or issued any Grand Jury subpoenas for two primary reasons: (1) these tools would alert the co-conspirators to the investigation before the full scope of the conspiracy was determined; and (2) the warrants/subpoenas would be unsuccessful in uncovering broader information regarding the conspiracy, such as stash house locations and cash flow. 1/13/11 Pak Aff. ¶¶ 44-45. Defendants contend that "[t]here is nothing in this section that indicates why any of these specific investigative techniques would not be fruitful in this investigation." Def. Edwards' Mot. at 13.

To the contrary, Special Agent Pak explained that although a search of Bowman's residence would likely confirm the agents' suspicions that it served as a stash house, a search would be unlikely to reveal additional stash locations, the identity of co-conspirators, or the full scope of the conspiracy. 1/13/11 Pak Aff. ¶ 44. Likewise, the Affidavit noted that the Government did not have sufficient information regarding Bowman's drug trafficking organization to effectively issue targeted subpoenas for financial records. *Id.* at ¶ 45. The application for the initial wiretap for TT2 offered specific reasons as to why search warrants and Grand Jury subpoenas would be ineffective to reveal the full scope of the conspiracy *in this case*, and therefore satisfied the Title III necessity requirement on this front.

### 5.    Pen Registers

The Affidavit asserted that call detail records and pen registers were useful to some extent, but would not satisfy the Government's burden of proof at trial because the registers alone provide no information regarding the content of the conversations taking place. 1/13/11 Pak Aff. ¶ 47. In terms of call detail records and pen registers, the Defendants are correct that the Affidavit provides only "boilerplate assertions" in the relevant paragraph. However, "[s]ections of an affidavit framed in conclusory terminology" cannot be separated from "preceding detailed descriptions" of investigative efforts. *United States v. Sobamowo*, 892 F.2d 90, 93 (D.C. Cir. 1989). Special Agent Pak's Affidavit indicates that using pen registers, agents were able to establish a usage pattern on TT2 of "a larger number of calls to a limited number of phone numbers, and calls of a short duration," typical of narcotics trafficking. 1/13/11 Pak Aff. ¶ 32. Furthermore, call records established that TT2 contacted or attempted to contact suspected co-conspirators Colter and Ismaeel. *Id.* at ¶¶ 33-34. The use of pen registers in this case, and the inherent nature of pen registers (as described by Special Agent Pak) logically lead to the ultimate

conclusion offered in the Affidavit that pen registers are "useful mainly in establishing relationships and patterns of operations," but "provide little direct evidence as to the significance of the telephone calls." *Id.* at ¶ 47.

Defendants further contend that wiretaps were unnecessary because using pen registers, the Government could identify individuals with a high level of contact with Bowman, then use physical surveillance and controlled buys to confirm involvement in the conspiracy. As explained above, controlled purchases alone could not have revealed the full extent of the conspiracy. The combination of pen registers and controlled buys could have—and did— provide some relevant information. The limitations on these techniques in this case, as explained in Special Agent Pak's Affidavit, demonstrated wiretaps were necessary to achieve the full objective of the investigation.

6. <u>Combined Traditional Investigative Techniques</u>

In addition to disputing the effectiveness of individual investigative methods, Defendants contend that wiretap interceptions were not necessary because the combination of traditional tools employed by investigators were sufficient. *E.g.*, Def. Edwards' Mot. at 12. Defendants correctly note that the combination of pen registers, physical surveillance, and confidential sources enabled the investigators to arrange and observe controlled buys of narcotics from Bowman. However, even in combination the information gathered provided limited insight into the conspiracy. The Government was unable to determine, among other things, where in his apartment building Bowman stored the narcotics, 1/13/11 Pak Aff. ¶ 40, the location of other stash houses, *id.* at ¶ 40, or where assets and proceeds related to the conspiracy were held, *id.* at ¶ 45. That combining techniques provided relevant information does not mean investigators were foreclosed from using wiretaps to determine the full extent of the conspiracy. *Becton*, 601

F.3d at 596. Defendants harp on the fact that many of the limitations identified by Special Agent Pak are common issues in law enforcement investigations. The fact that officers might run into similar barriers in other investigations has no bearing on whether or not Special Agent Pak provided an adequate factual basis to show those barriers were present *in this investigation*. Ultimately, the Pak Affidavit provided sufficient facts to support Chief Judge Lamberth's determination that the necessity requirement had been met, and thus the initial wiretap on TT2 was properly authorized. *Sobamowo*, 892 F.2d at 93.

> **B.      Defendants Failed to Sufficiently Challenge the Government's Minimization Efforts**

In his motion to suppress, Defendant Edwards challenged the Government to "make a prima facie showing that minimization was complied with respecting conversations between Edwards and others." Def. Edwards' Mot. at 22. Defendant's request reverses the order of proof required in the context of minimization challenges.

> What the wiretapping statute forbids is failure by the government to make reasonable efforts to minimize interceptions of non-pertinent communications; consequently, a defendant must identify particular conversations so that the government can explain their non-minimization. Having failed to identify "specific conversations that should not have been intercepted, or even . . . a pattern of such conversations," the issue of reasonable minimization [is] simply not in play.

*Carter*, 449 F.3d at 1295 (quoting *United States v. Anderson*, 39 F.3d 331, 342 (D.C. Cir. 1994)). The Government is not required to make any showing regarding its minimization efforts unless and until the Defendants identify "any conversation or pattern of conversations by which the [Court] could determine whether or not the government [has] met its minimization obligations." *Id.* Having failed to do so, Defendants' minimization argument fails.

> **C.      Defendants are Not Entitled to a Franks Hearing**

Defendants argue that Special Agent Pak knowingly and intentionally, or with reckless

disregard for the truth, omitted material information from the Affidavit. An affidavit filed in support of an application for a Title III wiretap is presumptively valid. *United States v. Maynard*, 615 F.3d 544, 550 (D.C. Cir. 2010). However,

> where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

*Franks*, 438 U.S. at 155-56. This test applies to material omissions from affidavits as well as false statements. *United States v. Johnson*, 696 F.2d 115, 118 n.21 (D.C. Cir. 1982). An omission is "material" only if its "'inclusion in the affidavit would defeat probable case.'" *United States v. Spencer*, 530 F.3d 1003, 1007 (D.C. Cir. 2008) (quoting *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990)). The Defendants must make a substantial showing that is "more than conclusory" and "accompanied by an offer of proof." *United States v. Gatson*, 357 F.3d 77, 80 (D.C. Cir. 2004).[2] Defendants contend that the Affidavit omitted two material issues that require a *Franks* hearing: (1) prior investigations of Bowman and Edwards; and (2) prior use of investigative techniques Special Agent Pak claimed would not be fruitful in this case. The Court finds Defendants failed to make a substantial showing that the purported omissions were material, and therefore an evidentiary hearing is not required.

      1.      <u>The Failure to Disclose Prior Investigations of Bowman and Edwards was Not a Material Omission</u>

Defendants identify several prior "investigations" of Edwards and Bowman that,

---

[2] Without any reference to authority, Defendant Edwards asserts that he need only provide a "statement of supporting reasons" to satisfy his burden to make an offer of proof. Def. Edwards' Mot. at 5. The *Franks* decision indicates defendants are required to submit not only "a statement of supporting reasons," but also "[a]ffidavits or sworn or otherwise reliable statements," or an explanation as to why the affidavits could not be furnished. *Franks v. Delaware*, 438 U.S. 154, 171 (1978).

according to Defendants, belie the stated intention of the wiretap, that is, to gain information regarding Bowman's sources and co-conspirators, their roles/relationships, and methods of packaging and distribution. Def. Edwards' Mot. at 15-16. The Defendants identify the following investigations as relevant:

- "Early 2000s" investigation "into alleged crimes committed by" Edwards, Earl Davis, Terrence Jones, Thomas Holley, Bowman, James Parker, Shawn Lucas, and Robert Richards;

- 2004 investigation of Earl Davis, who was arrested for murder while accompanied by Edwards;

- 2007 investigation of Edwards involving "alleged federal drug trafficking and murder conspiracy";

- A separate conspiracy charged in *United States v. Glover*, No. 07-153 (D.D.C. Filed June 12, 2007);

- 2008 search warrant executed at the residence shared by Robert Richards and Terrence Jones; and

- 2008 Grand Jury subpoena issued to Katrina Belton, the mother of Edwards' child.

The parties devote a great deal of effort to discussing particular facts about each investigation. The Defendants in particular lose the forest for the trees: the stated purpose of the wiretap application was to develop information regarding *Bowman's* operation, including sources, co-conspirators, and methods of distribution. To the extent the Government had knowledge of *Edwards'* illicit activities, Defendant Edwards does not show (or even attempt to show) that this information satisfied the objectives regarding *Bowman* as stated in the Affidavit. *See* 1/13/11 Pak Aff. ¶ 9b. Defendants claim that "the government deftly portrayed Bowman, a known associate of Edwards', as the initial target of the investigation," but offer no basis for the Court to ignore the stated intention of the wiretap: to intercept communications from *Bowman's* telephone in order to gain information about *Bowman's* drug trafficking operation. *Id.* at ¶¶ 7,

9b.   The Government's suspicion that Edwards supplied Bowman with narcotics does not undermine the Government's representation that the purpose of the investigation was to discover the scope of Bowman's narcotics-related activity.

Defendants generally allege that the early investigations "reveal[] a pattern that federal law enforcement was accumulating information about Edwards and, by extension, his associates," but this conclusory statement falls far short of a substantial showing that the Government withheld material information regarding the scope of its knowledge of Bowman's drug trafficking organization in seeking to intercept wireless communications with Bowman. Defendants provide no explanation for the Government's purported knowledge of the roles and relationships of Bowman's co-conspirators, methods of packaging and distribution, nature and scope of the conspiracy, financing and use of proceeds, or numerous other aspects of the investigation.   Assuming Defendants could show the Government knew Edwards supplied Bowman with narcotics and that Edwards was Bowman's only supplier, there remain a number of significant aspects of Bowman's operation that the Government lacked information on. 1/13/11 Pak Aff. ¶ 9b(i)-(iii), (v)-(xiii).  Negating a single purpose of the wiretap does defeat the necessity finding for the entire wiretap authorization.  *United States v. Reed*, 575 F.3d 900, 911 (9th Cir. 2009) ("[T]he necessity requirement is directed to the objective of the investigation as a whole.")).

The lack of materiality is particularly striking with regards to the investigations of Edwards between 2001 on 2007, during which time Bowman was incarcerated.  Gov't Resp. at 18.  Defendants provide no explanation as to how investigation of Edwards' conduct during this time frame is material to the Government's knowledge of Bowman's alleged drug trafficking, which did not begin (or resume) until at least 2008.  Defendants' assertion regarding the

materiality of the 2008 investigation of Terrence Jones takes speculation to a whole new level. Several basic facts are undisputed: (1) in 2008, agents executed a search warrant of the residence occupied by Jones and Richards; (2) neither Jones nor Richards were charged in connection to the drugs recovered during the search; and (3) later in 2008, Jones was arrested on narcotics charges, which led to his incarceration beginning in 2010. From this, Defendants allege that the investigation of Bowman "was a continuation of the Jones investigation." Def. Edwards' Reply at 17. Defendants' only support for this assertion is that Jones' telephone number was intercepted on Bowman's pen register (though Defendants do not disclose how many times), and the initial indictment in this case alleged the conspiracy began in 2008. *Id.* at 17-18. In his Reply, Defendant Edwards places great weight on a purported statement by Agent Bevington— made in 2012—that Agent Bevington believed Jones should have been charged in this case. Defendants claim this statement was a tacit admission that the 2008 investigation of Jones and the investigation in this case concerned a single conspiracy. This argument assumes the conclusion Defendants seek to prove: that all of Jones' narcotics-related activity, dating back to 2008, was part of the conspiracy in this case. Defendants offer no evidence to establish the link between Jones' narcotics activity in 2008 and the conspiracy at issue here. Even if the Court were to take the multiple leaps of logic Defendants' theory requires, the Court would still lack any evidence that the 2008 Jones investigation revealed any of the information purportedly sought by the January 13, 2011 wiretap application such that the Jones investigation would have been even arguably material to the necessity finding.

The only offer of proof submitted by the Defendants demonstrating any sort of connection between prior investigations and Defendant Bowman is the affidavit submitted by Katrina Belton. Ms. Belton's submission indicates that in "2008 or 2009" she was subpoenaed

to appear before a Grand Jury in Greenbelt, Maryland.  Belton Decl., ECF No. [303-2], ¶ 3.  Ms. Belton indicates she was questioned "about Mr. Edwards and his associates," and shown pictures of Mr. Edwards, Bowman, Jones, Richards, James Parker, and Earl Davis.  *Id.* at ¶ 4.  Ms. Belton states that "[f]rom the questions being asked, it was obvious to me that the agents and officers already knew a great deal of information about Mr. Edwards and his associates," but offers no further insight into her discussions with the authorities.  *Id.*  At best, Defendants make a substantial showing that as of January 2011, the Government knew Edwards and Bowman were associates, but this in and of itself would not defeat the finding of necessity or probable cause.

For his part, Defendant Bowman focuses on the fact the Government omitted from the January 13, 2011 affidavit any discussion of the volume of calls between TT3 and Edwards, Richards, and Moorer.[3]  Def. Bowman's Mot. at 5.  Defendant Bowman offers that the number of contacts between these three co-Defendants and Bowman far exceed the contacts between Bowman and Colter and Ismaeel, who were mentioned in the January 13, 2011 affidavit.  *Id.*  Defendant Bowman offers no explanation as to why inclusion of this information in the January 13, 2011 affidavit would have defeated probable cause, and the Court will not make Defendant's arguments for him.

Defendant Bowman also emphasizes information purportedly provided by CS-4, referenced by the Government for the first time in the March 19, 2011 affidavit in support of the first application for a wiretap interception on TT3.  3/21/11 Pak Aff. ¶ 21.  The affidavit

---

[3]  To the extent Defendants are correct that the Government was obliged by statute to disclose Edwards as a target of the January 13, 2011 authorization, *see United States v. Kahn*, 415 U.S. 143 (1974), this does not mean the Court is required to suppress the results of the interceptions.  The Defendants never contest the Government's assertion that the good faith exception to the exclusionary rule would apply, and the intercepted communications would thus still be admissible.  Gov't Resp. at 24.

indicates that CS-4 has provided information to law enforcement agents for at least 10 years, has known Bowman, Edwards, and Richards for over ten years, and in February 2011, informed law enforcement officials that he had seen Edwards and Bowman together in the last three months. *Id.* CS-4 also "advised that through CS-4's own observations and familiarity with Richards, Edwards, and Bowman, CS-4 knows that they are acquainted and are working in concert to traffick in narcotics." *Id.* From this, Defendant Bowman argues that "[t]hose assertions, in addition to the pen register information taken from Mr. Edwards' telephone, support the defendant's position that law enforcement knew of the drug operation and its participants for many years." Defendant Bowman offers no proof to support his assertion that law enforcement knew of CS-4's "own observation and familiarity" prior to February 2011, or what those observations might have entailed.

Similarly, Defendant Edwards argues—yet again, for the first time in his Reply—that "Agent Pak's introduction of CS4 in the March 19 Affidavit is extremely misleading because it gave the issuing courts the false impression that law enforcement learned of the illicit relationship between Bowman, Edwards, and Richards from CS4." Def. Edwards' Reply at 7. The Court notes that Defendant Bowman's argument regarding CS-4 in fact implies that the Government did learn about this "illicit relationship" from CS-4. In any case, the Defendants fail to articulate how this representation was material to the finding of probable cause or necessity in January or March 2011. The omission of a cooperating source does not, without more, invalidate a warrant that otherwise establishes probable cause and the necessity of interceptions. *Becton*, 601 F.3d at 597. Absent evidence CS-4 provided the Government with information that would overcome the probable cause or necessity showings in Special Agent Pak's Affidavit(s), the omission of CS-4 from the January 13, 2011 wiretap application was

immaterial.

2.   The Omitted Investigations Do Not Show Traditional Investigative Techniques Would Have Revealed the Full Scope of the Conspiracy

Defendants finally argue that the specific methods employed by agents during the earlier investigations demonstrate traditional tools were adequate to achieve the objective of the investigation.  Initially, it is important to note that none of the traditional investigative techniques referenced by the Defendants as part of this argument were employed against *Bowman*, and therefore do not disturb the finding that such techniques would not reveal the full scope of Bowman's drug trafficking organization.  Additionally, these prior investigations reinforce the conclusion that such techniques could reveal the full scope of Bowman's organization, rather than undermine such a conclusion.[4]  There is no allegation that Edwards was ever charged, much less convicted, of any offenses in connection with the early 2000s, 2004, or 2007 investigations.  The 2008 search warrant concerning Jones and Richards likewise failed to lead to any convictions.  Neither the 2004 search of Edwards' residence, nor Ms. Belton's Grand Jury testimony yielded any identifiable results.  The Court notes that Defendants failed to offer any explanation as to what information law enforcement obtained from these traditional techniques such that the Court could find these methods overcome the facts in the Affidavit supporting the necessity of a wiretap.  Just because the Government utilized certain techniques in the past does not mean that (1) those techniques achieved the full objective of the investigation, *Becton*, 601 F.3d at 596, or (2) that the situations in which those methods were employed were sufficiently analogous so as to be relevant to the effectiveness of the same methods in the investigation at issue in this case.  The prior uses of traditional investigatory techniques as proffered by the

_____

[4] Defendant Edwards cites no authority for his assertion that the Government is obliged to include every possible fact that might support a showing of necessity in an application for a Title III wiretap.  *See* 18 U.S.C. § 2158(1)(c).

24

Defendants simply would not disturb the necessity finding based on Special Agent Pak's Affidavit, and are therefore immaterial and do not warrant a *Franks* hearing.

## IV. CONCLUSION

For the reasons stated above, the Court finds the Title 3 wiretap interceptions employed in this case were properly authorized. The Affidavit submitted by FBI Special Agent Timothy Pak in support of the wiretap applications provided sufficient factual detail of this particular investigation to support a finding that traditional investigatory techniques were inadequate to reveal the full scope of Defendant Bowman's alleged drug trafficking conspiracy, satisfying the "necessity requirement" for obtaining a wiretap. The Defendants failed to identify any non-relevant conversations intercepted as part of the wiretaps, therefore the Court need not examine the Government's minimization efforts. The prior investigations of Defendant Edwards and his "associates," if included in the affidavit, would not have undermined the stated purpose for the wiretap. Finally, information regarding the prior investigative techniques would not have altered the finding of necessity. Since the omitted investigations were not material to the finding of probable cause to issue the wiretaps, the Defendants are not entitled to a *Franks* hearing on their challenge to the facially valid affidavit. Accordingly, Defendant Edwards' [247] Motion to Amend Motion to Suppress Evidence Obtained from Interception of Wire Communications is GRANTED; Defendant Edwards' [241], [242], [244], and Defendant Bowman's [248], [252], [253], [256], and [257] motions *in limine* are DENIED. An appropriate Order accompanies this Memorandum Opinion.

　　　　　　　　　　　　　　　_____/s/_____
　　　　　　　　　　　　　　　**COLLEEN KOLLAR-KOTELLY**
　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE